IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN C. GRIMBERG CO., INC.                :

                                                   :

    v.                                      :    Civil Action No. DKC 22-2586

                                                   :

NUDURA CORPORATION, et al.                :

                                                   :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this construction law case are: (1) the partial motion to strike rebuttal expert disclosures filed by Defendants Nudura Corporation, Nudura Systems, Inc. (collectively, "Nudura"), and Tremco Construction Products Group, Inc. ("Tremco") (collectively with Nudura, "Defendants") (ECF No. 50); (2) the motion for summary judgment filed by Defendants (ECF No. 62); (3) the motion in opposition to Defendants' motion for summary judgment and cross-motion for partial summary judgment filed by Plaintiff John C. Grimberg Co., Inc. ("Grimberg" or "Plaintiff") (ECF No. 75); and (4) the motion for leave to file summary judgment appendices filed by Defendants (ECF Nos. 85). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendants' motion for summary judgment will be granted, Plaintiff's cross-motion for partial summary judgment will be denied, Defendants' motion for

leave to file summary judgment appendices will be granted, and Defendants' partial motion to strike rebuttal expert disclosures will be denied as moot.

## I.  Background

### A. Factual Background[1]

Plaintiff is a general/mechanical contractor that performs construction projects in the Washington, D.C. area.  Both Nudura entities are manufacturers of Insulated Concrete Form ("ICF") wall systems.  Tremco is a manufacturer of various products in the construction industry, including ICF wall systems.  Both Nudura entities are divisions of Tremco.  Progressive Construction Solutions Group, Inc. ("PCS Group"),[2] is a construction contractor with experience constructing ICF walls.

On December 1, 2016, Andy Horgan ("Mr. Horgan"), Nudura's Director of Commercial Business, emailed Plaintiff to confirm that Grimberg was bidding on the Middle/High School Replacement Project in Quantico, Virginia (the "Project").  (ECF No. 75-2, at 1).[3]  In

---

[1] Unless otherwise noted, the following facts are undisputed.

[2] The PCS Group has not answered or responded to the original complaint.  On March 1, 2023, an order of default was entered as to the PCS Group.  (ECF No. 24).  It does not appear that PCS Group was served with the Amended Complaint.  Plaintiff will be directed to provide a status report on claims against PCS Group.

[3] Pin cites to documents filed on the court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

the email, Mr. Horgan stated that Nudura was "used as the basis of design for the ICF walls." (*Id*.). Additionally, Mr. Horgan provided Plaintiff with a list of ICF subcontractors that "expressed interest in bidding the [P]roject," in response to a request for installation contractors with the "required experience to build a project of this scope and complexity." (*Id*. at 1-3). One of the ICF subcontractors was the PCS Group. (*Id*. at 3).

In November 2017, Naval Facilities Engineering Systems Command ("NAVFAC") awarded the construction contract to Plaintiff to begin in 2018. (ECF No. 38 ¶ 12). On December 18, 2017, a "Scope Review" meeting was held at Plaintiff's Rockville, Maryland, office. The meeting was attended by Steve Grimberg, Plaintiff's then Vice President and current President, Kevin Kelly, Plaintiff's Purchasing Director, Josh Daniel, Plaintiff's Quality Control Manager, Jerry Elmore, Plaintiff's Project Manager, Mr. Horgan, Nudura's Director of Commercial Business, and Ted Hartner, President of the PCS Group. (ECF Nos. 62-1, at 4; 75, at 8).

On January 4, 2018, Plaintiff and the PCS Group entered a subcontract for the PCS Group to "furnish all supervision, labor, materials, plant, scaffolding, tools, equipment, supplies, and all other things necessary to complete in place the [Project]." (ECF No. 62-4, 1). Specifically, under the subcontract, the PCS Group

was required to "[f]urnish and install ICF concrete systems complete per plans, specifications, and addenda." (*Id.* at 2).[4]

On January 28, 2018, Mr. Horgan sent a letter to Plaintiff stating:

> Nudura will be assigning or designating personnel to provide technical assistance and oversight during the ICF installation. . . . The technical adviser(s) will be on site periodically during the ICF construction and may also participate in weekly construction meetings as and when required to assist PCS (ICF Installer) and John C. Grimberg coordinate all interface with ICF wall system.

(ECF No. 62-16, at 1). Mr. Horgan was listed as a "technical adviser," and Randy White was listed as an "alternate advisor." (*Id.*). Due to unexpected issues, construction of the ICF walls was delayed for approximately one year. (ECF Nos. 62-7, at 24-27; 62-8, at 13-17).

On January 26, 2018, Plaintiff received Request For Information 22 ("RFI 22") from the PCS Group, which Mr. Horgan reviewed. (ECF No. 75-8, at 5). On April 19, 2018, Mr. Daniel (Grimberg) sent an email addressed to Mr. Hartner (PCS Group) and Mr. Horgan (Nudura) stating:

> Ted [Hartner],
>
> As discussed yesterday, I look forward to meeting you on site, [n]ext Thursday and or

---

[4] The PCS Group signed the subcontract on February 13, 2018, and Plaintiff signed the subcontract on November 7, 2018, but the parties agree the subcontract was effective January 4, 2018. (ECF Nos. 62-1, at 5).

> Friday am. However, in the meantime it is
> imperative you provide the [i]nformation Ken
> Hancock requested at the end of Monday[']s
> Conference Call, which was simply a recap of
> the discussion (RFI 22) and provide the
> additional sketches.

(ECF No. 75-22, at 1). Mr. Horgan was never provided notice that he was chosen as the "Technical Advisor," and believed Mr. Hartner was serving as the Technical Advisor on the Project. (ECF No. 62-18 ¶ 4).

Months later, on January 30, 2019, Plaintiff held a preparatory/ preconstruction meeting, which was attended by three of Plaintiff's employees, a representative of NAVFAC, and two PCS Group principals. (ECF No. 62-9, at 1). Plaintiff contends that Mr. Hartner, President of PCS Group, was present at the meeting as Nudura's representative (ECF No. 75-16, at 4), however, the meeting minutes do not list Nudura as an organization that was represented at the meeting. (ECF Nos. 62-9; 75-24, at 1).

On February 27, 2019, Plaintiff and Nudura separately contracted for the purchase and sale of ICF wall form components ("Purchase Order").[5] (ECF No. 62-3). Plaintiff simultaneously "issued a deduct of the amount of the Grimberg-Nudura Purchase Order from Grimberg's subcontract with [t]he PCS Group." (ECF No. 75-3 ¶ 18). The PCS Group began installing the ICF walls in

---

[5] Plaintiff contends that the Purchase Order was an opportunity to contract with Nudura for the technical support services Nudura previously promised. (ECF No. 75-3 ¶ 17).

March 2019 and continued until March 2020. The Project specifications required the PCS Group to comply with Nudura's installation manual when installing the ICF walls. (ECF No. 62-13, at 8). Nudura's installation manual states, in relevant part, that "NUDURA recommends alternating the position of the horizonal reinforcing steel from one successive course to another. This practice creates a cage that maintains the alignment of the vertical reinforcing steel which will be installed later (See Section 6.8)." (ECF No. 62-12, at 9). Section 6.8 of the manual states:

> Once the vertical steel has been determined, simply start at the corner that has been designated as the starting point for concrete placement and weave the vertical steel between the horizonal steel. This will lock the vertical steel into place and prevent it from moving side to side within the wall cavity.
>
> In most of NUDURA's forms, if the vertical steel specified is below No. 5 (15M) in diameter, the horizontal dowels may not fully capture the steel solidly enough to prevent it from moving in the longitudinal direction of the wall axis. In this case, the vertical steel can simply be placed against the webs that are already vertically aligned in the wall. The installer then allows the concrete to push the bar against the web during placement. This will ensure the vertical steel is exactly vertical during placement and that it won't move out of position.

(*Id.* at 11). On July 28, 2021, the Navy wrote to Plaintiff informing it that the ICF walls were non-compliant with contract

6

standards and that the walls would need to be "demolished and reconstructed," to comply with contract standards. (ECF No. 75-28, at 1). On August 19, 2021, the Navy sent another letter to Plaintiff, informing it that the weaving method recommended in Nudura's online installation manual would "satisfy the concern of bars shifting during concrete placement[,]" however "[n]o request to construct in this manner was received." (ECF No. 75-29, at 5).

Plaintiff began demolishing and rebuilding the ICF walls on the Project in the Fall of 2021, the total cost of which was approximately $24,859,645.58. (ECF No. 75-30, at 5).

### B. Procedural Background

Plaintiff filed a complaint on October 9, 2022 (ECF No. 1), and an amended complaint on November 14, 2023 (ECF No. 38). Defendants moved for summary judgment on June 17, 2024 (ECF No. 62). Plaintiff filed an opposition to Defendants' motion for summary judgment and a cross-motion for partial summary judgment on July 15, 2024 (ECF No. 75). Defendants opposed Plaintiff's cross-motion and replied in support of their motion for summary judgment on August 12, 2024 (ECF No. 84). Defendants moved for leave to file summary judgment appendices on August 12, 2024 (ECF No. 85), which was supplemented on August 13, 2024 (ECF No. 86). Plaintiff opposed Defendants' motion on August 15, 2024 (ECF No. 87), and Defendants replied on August 21, 2024 (ECF No. 89).

Plaintiff filed a reply to Defendants' opposition to Plaintiff's motion for summary judgement on August 30, 2024 (ECF No. 91).

## II.  Motion to Exceed Page Limitations

Local Rule 105.3 mandates that "[u]nless otherwise ordered by the Court, memoranda in support of a motion or in opposition thereto . . . shall not exceed thirty (30) pages[.]" Defendants acknowledge that the proposed summary judgment appendices exceed the allotted page limit.  Defendants contend the proposed appendices are necessary to address the "Summary/Statement of Material Facts" section in Plaintiff's opposition/partial cross-motion for summary judgment.  (ECF No. 85, at 1).  Plaintiff objects to the appendices "to the extent they contain both factual and legal argument." (ECF No. 87 ¶ 3).  Plaintiff contends that Defendants are "flyspecking the record in this case with irrelevant, incomplete or misleading citations to the record." (*Id.* ¶ 4).

"Although [c]umbersome filings . . . are a considerable drain on judicial resources," Defendants' motion for leave to exceed the page limitation will be granted, and the appendices will be considered in their entirety. *Marks v. Dann*, No. 13-0347-DKC, 2013 WL 8292331, at *5 (D.Md. July 24, 2013) (quoting *Sampson v. City of Cambridge, Md.*, No. 06-1819-WDQ, 2008 WL 7514365, at *3 (D.Md. June 5, 2008)) (internal quotations omitted).

### III. Standard of Review

A court may grant summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)) (alteration in original). "A mere scintilla of proof . . . will not suffice to prevent summary judgment[.]" *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (4th ed. 2022). The court has an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## IV. Analysis

Plaintiff brings the following claims against Defendants:

1) Count I - Breach of Contract
2) Count II - Indemnity
3) Count III - Promissory Estoppel/ Detrimental Reliance
4) Count IV - Breach of Express Warranty
5) Count V - Restatement (Second of Torts) Section 552, Information Negligently Supplied for the Guidance of Others
6) Count VI - Negligent Representation
7) Count VII - Professional Negligence
8) Count XI - Negligence

(ECF No. 38).

**A. Choice of Law**

"In diversity actions, a district court applies the substantive law and choice of law rules of the state in which the court sits." *State Farm Fire & Cas. Co. v. Huguely*, 432 F.Supp.3d 587, 591 (D.Md. 2020) (citing *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 605 (D.Md. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))). It is only necessary to conduct a choice of law analysis if the "relevant laws of the different states lead to different outcomes." *Perini/Thompkins Joint Venture v. Ace Am. Ins. Co.,* 738 F.3d 95, 101 (4th Cir. 2013) (citing *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F.Supp.2d 737, 750 (D.Md. 2003); *Int'l Adm'rs, Inc. v. Life Ins. Co. of N.Am*, 75 F.2d 1373, 1376 n.4 (7th Cir. 1985)). The parties agree that Maryland law applies to the contract claims. They disagree, however, on the law applicable to the tort claims. Defendants contend that Plaintiff's tort claims are governed by Virginia law, whereas Plaintiff argues that its tort claims are governed by Maryland law.

In tort claims, Maryland law follows the *lex loci delicti* rule which "requires a tort action be governed by the substantive law of the state where the wrong occurred." *First Union Nat. Bank v. N.Y. Life Ins. & Annuity Corp.*, 152 F.Supp.2d 850, 853 (D.Md. 2001) (quoting *Phillip Morris Inc. v. Angeletti*, 358 Md. 689, 746 (2000)). "The place of the tort is considered to be the place of the injury." *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529

F.Supp.2d 604, 608 (D.Md. 2008). "The place of injury has been further defined as the place where the last act required to complete the tort occurred." *First Union Nat. Bank*, 152 F.Supp.2d at 583 (citing Restatement (First) of Conflict of Laws § 377 (1934)).

Defendants argue that because Virginia is the site of the "allegedly defective construction and where Plaintiff claims it was required to demolish and rebuild the ICF walls" the alleged injury occurred in Virginia and therefore Virginia law applies. (ECF No. 62-1, at 11). Plaintiff contends that Defendants' "tortious misrepresentations and promises, as well as the resulting pecuniary loss occurred in Maryland[,]" and therefore Maryland law applies. (ECF No. 75, at 23).

It is not necessary to resolve the choice of law question because the outcome is the same under both Maryland and Virginia law. *See World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., Ltd.*, 783 F.3d 507, 514-15 (4th Cir. 2015) (citation omitted).

**B. Contract Claims**

The amended complaint identifies the Purchase Order as the contract, and alleges that "Nudura materially breached [that contract] by failing to provide technical support and oversight for the construction of the ICF wall system by its certified installer the PCS Group." (ECF No. 38 ¶¶ 169, 172). Plaintiff argues that Mr. Horgan's January 28, 2018 "certifications" are

also a formal part of the contract. (ECF No. 75, at 27-28).
Defendants contend that Plaintiff raises this theory of liability
for the first time in its cross-motion for summary judgment. (ECF
No. 84, at 14-15). Plaintiff responds that the January 28, 2018
"certifications" specified the technical support and oversight
required by the Purchase Order. (ECF No. 91, at 12).   The amended
complaint asserts that:

> Steve    Grimberg    understood    that
> the . . . Purchase Order incorporated Andy
> Horgan's    specific    promises    and
> representations made in his December 1, 2016
> email submissions . . . and his statements
> made at the . . . [m]eeting that occurred on
> December 18, 2017 . . . that Nudura's
> technical representative would render on-site
> technical support and oversight for the ICF
> wall construction.

(ECF No. 38 ¶ 120).  The next paragraph alleges that "these prior
representations and promises were incorporated into the Grimberg-
Nudura Purchase Order." (*Id.* ¶ 121).  The amended complaint does
not specifically assert that the January 28, 2018 certifications
were part of the Purchase Order.   The January 28, 2018
certifications are expressly mentioned in relation to the claims
for breach of express warranty (*Id.* ¶ 191) and negligent
misrepresentation *(Id.* ¶ 211).  Thus, the breach of contract claim
does not assert specifically that the January 18, 2018
certifications were a formal part of its contract with Nudura.

13

The United States Court of Appeals for the Fourth Circuit has explained "a plaintiff may not raise new claims after discovery has begun without amending [the] complaint." *Wahi v. Charleston Area Med. Ctr., Inc.* 562 F.3d 599, 617 (4th Cir. 2009) (citation omitted). Plaintiff did not plead that the January 28, 2018, certifications were part of the contract in its amended complaint and therefore cannot argue this new theory at the summary judgment stage. *See id.* Therefore, the January 28, 2018 certifications will not be considered to the extent Plaintiff argues they constitute a formal part of the contract between the parties.

**1. Breach of Contract (Count I)**

Defendants argue they are entitled to summary judgment for Plaintiff's breach of contract claim because "Plaintiff cannot present sufficient evidence to support the claim." (ECF No. 62-1, at 16). Plaintiff, in turn, contends that it is entitled to summary judgment because Nudura did not provide "technical support when required." (ECF No. 75, at 28).

"Under Maryland law, the elements of a claim for breach of contract are 'contractual obligation, breach, and damages.'" *Tate v. Am. Gen. Life Ins. Co.*, 627 F.Supp.3d 480, 489 (D.Md. 2022) (quoting *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020)).

> The interpretation of a contract is "ordinarily a question of law for the court," *Grimes v. Gouldmann*, 232 Md.App. 230, 235, 157

14

A.3d 331 (2017), as is the question of whether
contract terms are ambiguous, *Calomiris v.
Woods*, 353 Md. 425, 434, 727 A.2d 358 (1999).
In conducting this inquiry, a court's
interpretation of a contract is generally
"limited to the four corners of the
agreement." *Walton v. Mariner Health of
Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584
(2006). When interpreting a contract, courts
determine "what a reasonable person in the
position of the parties would have meant at
the time it was effectuated." *General Motors
Acceptance v. Daniels*, 303 Md. 254, 261, 492
A.2d 1306 (1985). To this end, the language
of disputed contractual provisions must be
read "in context, which includes not only the
text of the entire contract but also the
contract's character, purpose, and 'the facts
and circumstances of the parties at the time
of execution.'" *Credible Behavioral Health,
Inc. v. Johnson*, 466 Md. 380, 394, 220 A.3d
303 (2019) (quoting *Ocean Petroleum Co. v.
Yanek*, 416 Md. 74, 88, 5 A.3d 683 (2010)).
Nevertheless, it is "improper for the court to
rewrite the terms of a contract, or draw a new
contract for the parties, when the terms
thereof are clear and unambiguous."
*Calomiris*, 353 Md. at 445, 727 A.2d 358
(citing *Canaras v. Lift Truck Services*, 272
Md. 337, 350, 322 A.2d 866 (1974)). "[C]ourts
should avoid interpreting contracts so as to
nullify their express terms." *Id.* at 441–42,
727 A.2d 358 (citing *State Hwy. Admin. v.
Bramble*, 351 Md. 226, 237, 717 A.2d 943
(1998)).

*Id.*, at 490.

The Purchase Order states, in relevant part:

The Purchaser acknowledges that NUDURA does
not have any control over the installation or
workmanship used in the assembly or the
installation of the NUDURA Products, although
**NUDURA will provide technical support when
required.** NUDURA shall not be held liable for
any general, special, direct, indirect or

> consequential damages, including bodily harm,
> that may be suffered by any person, including,
> without limitation, the installer, Purchaser,
> contractor, architect, engineer and home or
> business owner due to the use, assembly or the
> installation of the NUDURA Products.

(ECF No. 62-3, at 2) (emphasis added).  Neither party contends that the contract was ambiguous, particularly regarding the language of the Purchase Order providing for Nudura to "provide technical support when required."  Because the language of the Purchase Order is clear and unambiguous, there is no room to consider what the parties intended for the contract to mean.  *See Gen. Motors Acceptance Corp.*, 303 Md. at 261; *see also Calomiris*, 353 Md. at 432 ("Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term.") (citation omitted).

Plaintiff, however, argues that the language of the Purchase Order "implies an obligation to actively participate in the project[.]" (ECF No. 75, at 28).  Plaintiff contends "[t]he technical support required for the Project is defined in Nudura's January 28, 2018 [c]ertifications where Nudura agrees to follow the Project Specifications and designates Andy Horgan as the Project's Technical Advisor, as well as in the ICF Specifications." (ECF No. 91, at 12).  Plaintiff cannot alter the express terms of the unambiguous Purchase Order with the January 28, 2018

16

certifications.    The parol evidence rule precludes a party from presenting extrinsic evidence "to show that a parties' understanding was different than the written contract when it was conceded that the words were unambiguous."    *Hous. Auth. of Coll. Park v. Macro Hous., Inc.*, 275 Md. 281, 284 (1975).    The contract only required technical support "when required" and Plaintiff cannot vary that term by reference to a pre-contractual exchange. Plaintiff presents no evidence that Nudura failed to respond to requests for assistance.    The contract did not require presence or assistance otherwise.

Even if the Purchase Order was ambiguous so that resort to extrinsic evidence to ascertain the meaning is appropriate, the January 28, 2018 certifications would not alter the result.

> "When a writing is ambiguous, extrinsic evidence is admissible to determine the intentions of the parties to the document." *Point's Reach Condominium Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md.App. 222, 73 A.3d 1145, 1163 (2013); *see Sy-Lene [of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163,] 829 A.2d [540] at 544 [(2003)]* (stating that parol evidence showing the meaning of contract language "is only admissible after the court finds the contract to be ambiguous"); *see also Dumbarton [Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 54,] 73 A.3d [224] at 234 [(2013)]* (""Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its

adoption.'") (citation omitted).
"[E]xtrinsic evidence admitted must help
interpret the ambiguous language and not be
used to contradict other, unambiguous
language." *Calomiris* [], 353 Md. [at 441].

*C B Structures, Inc. v. Potomac Elec. Power Co.*, 122 F.Supp.3d

247, 252 (D.Md. 2015). Plaintiff argues that the required

technical support included:

> 1. Certifying pursuant to the ICF Wall
>    Specifications that the "installer has been
>    trained by the ICF manufacturer or an ICF
>    Technical Advisor to ensure product is
>    installed in accordance with the
>    manufacturer's published installation
>    manual and instructions" and (ii) the
>    installer has "experience in ICF wall
>    systems and successfully completed at least
>    three projects that are similar to this
>    project in size, scope and complexity."
>
> 2. The ICF Wall Specifications requirement
>    that the "ICF manufacturer's representative
>    or technical advisor must provide on-site
>    training to installer to ensure familiarity
>    of the ICF manufacturer's installation
>    procedures and technical manual."
>
> 3. Nudura's Certification that: "The technical
>    adviser(s) will be on site periodically
>    during the ICF construction . . . to assist
>    PCS (ICF installer) and John C. Grimberg
>    coordinate all interface with ICF wall
>    system."

(ECF No. 91 at 12-13 , referring to 75-5 at 3-9, and 91-2).

First, the January 28, 2018 certifications do not show that

Nudura "agree[d] to follow the Project Specifications[.]" The

January 28, 2018 "Product Approval" says the Nudura product will

"[c]omply with all specification requirements to supply [ICF] per

18

applicable codes, plans and specifications.  Detailed References, Submittals & Design Requirements as specified in Section 031119 [ICF] for the above referenced project."  (ECF No. 91-2, at 6). At most, the Product Approval required Nudura to supply ICF in accordance with the Project Specifications, nothing more.

Second, the January 28, 2018 certification stating "[t]he technical adviser(s) will be on site periodically during the ICF construction" contradicts the express language of the Purchase Order requiring the technical advisor provide technical assistance when "required."  (ECF Nos. 62-3, at 2; 91-2, at 3).  Even when extrinsic evidence is considered, it may not be used to contradict clear terms of the contract.  Plaintiff points to the declaration of Mr. Horgan in which he states he did not serve as the "technical advisor (as the role is described in the specifications for the Project)," (ECF No. 62-18 ¶ 5), but Plaintiff fails to cite any instances in which Mr. Horgan, or another agent of Nudura, was asked to provide technical support but failed to do so.

Because the Purchase Order is unambiguous and Plaintiff has not produced any evidence showing Nudura breached its obligations under the Purchase Order, Defendants' motion for summary judgment on Count I will be granted, and Plaintiff's cross-motion will be denied.

### 2. Indemnification (Count II)

Plaintiff's indemnity claim is premised on Nudura's alleged breach of contract. (ECF No. 75, at 28-29). The Purchase Order's indemnity clause reads, in relevant part:

> Each Party undertakes and agrees to fully indemnify, hold harmless and defend the other Party . . . from and against any and all actions, claims, demands, liabilities, losses, damages, settlements, judgments, costs or expenses of whatever kind . . . under this Agreement . . . resulting from their respective breach or non-fulfillment of any representation, warranty or covenant set out in this Agreement [.]

(ECF No. 62-3, at 2). Because summary judgment will be granted in favor of the Defendants on the breach of contract claim, Plaintiff's indemnity claim cannot proceed. Accordingly, as to Count II, Defendants' motion for summary judgment will be granted and Plaintiff's cross-motion will be denied.

### 3. Detrimental Reliance (Count III)

A claim for promissory estoppel or detrimental reliance under Maryland law requires a plaintiff to prove:

> [T]he existence of "a clear and definite promise"; (2) "where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee"; (3) "which does induce actual and reasonable action or forbearance by the promise"; and (4) "causes a detriment which can only be avoided by enforcement of the promise." *Pavel Enters., Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996). Further, promissory estoppel is a quasi-contractual claim, meaning "it is an equitable remedy that

20

> permits recovery 'where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise.'" *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 626 (D.Md. 2003) (emphasis added) (quoting *Swedish Civil Aviation Admin v. Project Mgmt. Enters., Inc.*, 190 F.Supp.2d 785, 792 (D.Md. 2002) (internal quotations and citations omitted)). Moreover, "'no quasi-contractual claim can arise when a contract exists . . . concerning the same subject matter on which the quasi-contractual claim rests.'" *Id.*

*Ezzat v. UGI/Amerigas Corp.*, No. 22-02918-RDB, 2023 WL 2864931, at *5 (D.Md. Apr. 10, 2023). Plaintiff's promissory estoppel claim is premised on the idea that "Nudura promised to provide technical services to the project[.]" (ECF No. 75, at 29). This type of claim is prohibited by Maryland law because a contract exists concerning the same subject matter as that of the quasi-contract claim. *See Ezzat*, 2023 WL 2864931, at *5. Therefore, as to Count III, Defendants' motion for summary judgment will be granted and Plaintiff's cross-motion will be denied.

### 4. Breach of Express Warranty (Count IV)

In Count IV, Plaintiff asserts a claim for breach of express warranty. Plaintiff argues that Nudura made the following express warranties:

> (1) The Project's ICF wall design was sufficient to construct ICF walls that would meet the Project's design criteria requirements, including resistance to specific design lateral loads for wind, seismic events and blasts set forth

21

> specifically on Structural Drawing S003; (2) The Project's ICF wall design, details, and specifications met Nudura's standard practices, and means and methods; (3) The PCS Group was adequately trained by Nudura as an ICF certified wall installer with sufficient experience to build a Project of this scope and complexity; and (4) Nudura would provide periodic technical oversight and support to The PCS Group during construction.

(ECF No. 75, at 30).

At the outset, the parties disagree on the governing law. Defendants contend the Purchase Order is for the sale of goods and therefore the contract is governed by Maryland Code Commercial Law Section 2-313, while Plaintiff contends the contract is for "technical support services" and is governed by the common law. (ECF Nos. 62, at 22; 75, at 30).

The Maryland Uniform Commercial Code governs "transactions in goods." Md. Code, Comm. Law, § 2-102. The term "Goods" is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale[.]" *Id.* at § 2-105. "Between the contract for the sale of goods and the service contract is the 'hybrid' or mixed sales and service contract." *DeGroft v. Lancaster Silo Co., Inc.*, 72 Md.App. 154, 165 (1987). The test to determine what law applies to a "hybrid" contract:

> [I]s not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of

> service, with goods incidentally involved
> (e.g., contract with artist for painting) or
> is a transaction of sale, with labor
> incidentally involved (e.g., installation of
> a water heater in a bathroom). *Burton* [*v.
> Artery Co., Inc.*], 279 Md. [94] at 108–09, 367
> A.2d 935 [(1977)] (quoting *Bonebrake v. Cox*,
> 499 F.2d 951, 960 (8th Cir. 1974)). *See also
> Snyder v. Herbert Greenbaum and Associates,
> Inc.*, 38 Md.App. 144, 147, 380 A.2d 618
> (1977).

*DeGroft*, 72 Md.App. at 165. "The courts also consider it significant whether the parties' agreement specifies any allocation between the costs of materials and services and the relative costs of the goods to the total contract price." *Id.* at 168.

The Purchase Order lists several units of ICF Forms and Accessories, each with pricing, totaling the $188,556.01 contract price. (ECF No. 62-3, at 1). The only mention of "technical support" or a service of any kind to be performed by Nudura appears under the "Terms and Conditions of Sale." There is no allocation of cost to the "technical support" services, and the price of the goods represents the whole contract price. Accordingly, the Purchase Order's predominant purpose is for the sale of goods, and it is governed by the UCC.

"A breach of warranty claim under Maryland law, separate from a breach of contract claim, requires a plaintiff to prove that the seller created an express warranty, the product did not conform to the warranty, and the lack of conformity caused the injury

23

suffered." *Metromont Corp. v. Allan Myers, L.P.*, No. 18-3928-DKC, 2021 WL 3367772, at *14 (D.Md. Aug. 3, 2021) (citing *Morris v. Biomet, Inc.*, 491 F.Supp.3d 87, 107 (D.Md. 2020). Maryland law provides:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Md. Code, Comm. Law, § 2-313(1). A seller does not need to intend to create a warranty "so long as a representation 'is made part of the basis of the bargain.'" *Morris*, 491 F.Supp.3d at 107 (quoting *Rite Aid Corp. v. Levy-Gray*, 391 Md. 608, 623 (2006). For an express warranty to exist under Maryland law, "there must be an affirmative statement of fact by the seller about the goods." *Id.* at 108 (quoting *Rite Aid*, 162 Md.App. at 692). The statements alleged to have been made by Nudura concern the Project's ICF wall design, the adequacy of the PCS Group's training, and Nudura's technical oversight. (ECF No. 75, at 30). Because none of these statements relate to the goods sold, they cannot serve as the basis for a breach of express warranty claim. *See Morris*, 491 F.Supp.3d

at 108.  Accordingly, Defendants' motion for summary judgment will be granted as to Count IV, and Plaintiff's cross-motion will be denied.

### C. Tort Claims

Plaintiff asserts the following tort claims against Defendants: Information Negligently Supplied for the Guidance of others (Count V), Negligent Misrepresentation (Count VI), Professional Negligence (Count VII), and Negligence (Count XI).

Defendants assert that Plaintiff's tort claims are barred by Virginia's source-of-duty rule because  "[i]t is beyond dispute that [Plaintiff] alleges nonfeasance and that the source of each duty [Plaintiff] alleges is the parties' contractual relationship, not the common law."  (ECF No. 62-1, at 15).  Plaintiff responds that, even applying Virginia law, the source-of-duty rule does not apply because: (1) pre-contractual representations made on December 1, 2016 by email, December 18, 2017 at the "scope review" meeting, and January 28, 2018 by letter, that Mr. Horgan would be the technical advisor for the Project and that the PCS Group was experienced and trained placed a duty independent of the contract on Nudura; and (2) Nudura had an independent duty to provide technical support because "it knew that the failure to provide technical support would expose the future occupants of the new school building to the risk of *personal injury or death*," which

creates a duty independent of the parties' contract.  (ECF No. 75, at 25-26).

The Fourth Circuit has explained:

> Virginia's source-of-duty rule delineates the boundary between tort and contract claims to protect against "turning every breach of contract into a tort."  *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 834 S.E.2d 244, 255 (2019) (quoting *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 808 S.E.2d 186, 193 (2017)). Accordingly, whether an action sounds in tort, contract, or both depends on the "source of the duty violated."  *Id.* at 254.  When a plaintiff brings a claim based on an alleged breach of a duty that arose "by mere agreement of the parties," as opposed to "by operation of law," then it sounds in contract and the source-of-duty rule prevents recovery in tort for that breach.  *Id.* (quoting *Glisson v. Loxley*, 235 Va. 62, 366 S.E.2d 68, 71 (1988)).

*Harrel v. DeLuca*, 97 F.4th 180, 189-90 (4th Cir. 2024).  Similarly, under Maryland law, "[w]here a controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businessmen, contract law – not tort law – provides the rule of decision by which the case is to be governed."  *Architectural Sys. v. Gilbane Bldg. Co.*, 779 F.Supp. 820, 822 (D.Md. 1991) (citing *Flow Indus., Inc. v. Fields Constr. Co.*, 683 F.Supp. 527, 529 (D.Md. 1988)).  "Mere negligent breach of a contract is not enough to sustain an action sounding in tort."  *Id.*  "It is only when a breach of contract is also a violation of a duty imposed by law that the injured party has a choice of remedies."  *Heckrotte v. Riddle*, 224 Md. 591, 595

(1961).  This court has explained Maryland's approach to imposing

tort liability in the context of business relations:

> Courts have been hesitant, however, to impose
> tort duties on sophisticated parties that have
> otherwise outlined their legal obligations
> through contract.  In *Martin Marietta Corp.*,
> 991 F.2d at 95-96, the defendant agreed to
> launch a satellite for the plaintiff and the
> launch failed, allegedly due to the
> defendant's negligence.  The court held that
> the defendant did not owe a legal duty beyond
> what was enumerated in the contract, reasoning
> that "[e]qually sophisticated parties who have
> the opportunity to allocate risks to third
> party insurance or among one another should be
> held to only those duties specified by the
> agreed upon contractual terms and not to
> general tort duties imposed by state law."
> *Id.* at 98; *see also CapitalSource Finance LLC
> v. Pittsfield Weaving Co.*, 571 F.Supp.2d 668,
> 674 (D.Md. 2006) ("Under Maryland law, 'a
> claim for negligent misrepresentation is
> improper when . . . the only relationship
> between the parties is contractual, both
> parties are sophisticated, and the contract
> does not create an express duty of due care in
> making representations'" (quoting *Martin
> Marietta*, 991 F.2d at 98)); *Rotorex Co., Inc.
> v. Kingsbury Corp.*, 42 F.Supp.2d 563, 575
> (D.Md. 1999) ("In a case involving a
> commercial transaction such as the one at
> issue here, the remedies provided . . . in the
> contract are exclusive."); *Blue Circle
> Atlantic, Inc. v. Falcon Materials, Inc..*, 760
> F.Supp. 516, 519 (D.Md. 1991) ("a claim of
> negligent misrepresentation causing economic
> loss in the course of a commercial transaction
> or relationship, at least where the parties
> are merchants, ought not be entertained"
> (internal citation omitted)); *Flow
> Industries, Inc.*, 683 F.Supp. at 530 ("Where
> . . . the controversy concerns purely economic
> losses allegedly caused by statements made
> during the course of a contractual
> relationship between businessmen, it is

> plainly contract law which should provide the
> rules and principles by which the case is to
> be governed."); *cf. Cooper v. Berkshire Life
> Ins. Co.*, 148 Md.App. 41, 86 n. 8, 810 A.2d
> 1045 (2002) (distinguishing between finding a
> duty for negligent misrepresentation between
> sophisticated parties in pre-contractual and
> post-contractual dealings).

*J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, No. 11-1948-DKC, 2012 WL 4341582, at *9 (D.Md. Sept. 20, 2012).

Plaintiff argues that the "pre-contractual representations" created a duty that predated the February 27, 2019 contract (ECF No. 75, at 25), but the representations cited still concern Nudura's contractual obligation to provide periodic technical support. (ECF Nos. 62-3; 62-16; 75-2). Counts V, VI, VII, and XI, are premised on the same duty as the Purchase Order. (ECF No. 38 ¶¶ 201; 209; 219; 254). Because the duty to provide technical support on the Project stems from the Purchase Order, the tort claims are barred under both Maryland and Virginia law.

Plaintiff seemingly argues, in the alternative, that the tort claims can still proceed because the recovery sought is for damages to property resulting from negligence. (ECF No. 75, at 24). In support, Plaintiff cites the holding in *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, which states "where the dangerous condition is discovered before it results in injury, an action in negligence will lie for the recovery of the reasonable cost of correcting the condition." 308

28

Md. 18, at 22 (1986).  Plaintiff, however, ignores that *Council of Co-Owners* contemplated tort liability where there was no contractual privity between the parties.  *Id.*  Here, the parties have privity of contract by virtue of the Purchase Order and therefore the holding in *Council of Co-Owners* does not apply.[6]

Accordingly, as to Counts V, VI, VII, and XI, Defendants' motion for summary judgment will be granted.

### D. Exculpatory Provision

Defendants assert that they are entitled to summary judgment based on an exculpatory provision in the Purchase Order.  (ECF No. 62).  Because summary judgment will be granted on other grounds, it is not necessary to address the validity of the exculpatory provision.

### V.  Motion to Strike Rebuttal Expert Disclosures

Defendants moved to strike Plaintiff's rebuttal expert disclosures (ECF No. 50), which Plaintiff opposed on May 17, 2024 (ECF No. 55).  Defendants filed a reply in support of their motion on May 30, 2024 (ECF No. 57).  Because summary judgment is granted

---

[6] Plaintiff makes the same argument under Virginia Code § 8.01-223, titled "Lack of privity no defense in certain cases" which states "[i]n cases not provided for in § 8.2-318 where recovery of damages for injury to person, including death, or to property resulting from negligence is sought, lack of privity between the parties shall be no defense."  VA Code Ann. § 8.01-223.  Because the parties have privity of contract, § 8.01-223 does not apply.

in favor of Defendants, their motion to strike Plaintiff's rebuttal expert disclosures (ECF No. 50) will be denied as moot.

## VI. Conclusion

For the foregoing reasons, Defendants' partial motion to strike rebuttal expert disclosures will be denied as moot, Defendants' motion for summary judgment will be granted, Plaintiff's cross-motion for partial summary judgment will be denied, and Defendants' motion for leave to file summary judgment appendices will be granted. A separate order will follow.


<u>                    /s/                    </u>
DEBORAH K. CHASANOW
United States District Judge